**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MALCOLM N.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | )    **No. 19 C 7895** |
| **v.** | ) |
| | )    **Magistrate Judge Gabriel A. Fuentes** |
| **KILOLO KIJAKAZI, Acting** | ) |
| **Commissioner of Social Security,**[2] | ) |
| | ) |
| **Defendant.** | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>[3]

Before the Court are Plaintiff Malcolm N.'s motion to remand the Administrative Law

Judge's ("ALJ") October 2018 opinion denying his application for Social Security disability

benefits[4] (D.E. 15) and the Commissioner's cross motion to affirm the opinion. (D.E. 26.)

---

[1] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On January 2, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 8.)

[4] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021). Plaintiff submitted to the Appeals Council a Psychological Evaluation and Mental Impairment Questionnaire completed by Louis Hemmerich, Ph.D., dated July 2019. (*See* R. 8-17.) The AC found that the ALJ decided

I.      **Background**

In 2011, when Plaintiff was entering his sophomore year of high school, he was diagnosed with autism spectrum disorder, depression and attention deficit hyperactivity disorder ("ADHD") by psychiatrist Christopher Hummel, M.D.; Dr. Hummel prescribed Doxepin (an anti-depressant) and Vyvanse (to treat ADHD), but Plaintiff stopped taking medication after a few months. (R. 332-42.) In January 2014, Plaintiff's annual Individualized Education Program ("IEP")[5] review noted that he had "severe and sustained impairment in social interaction," which "improved" during high school. (R. 222-23.) In addition, he often came tardy to class and needed extra time to complete tests, and there were concerns about him completing assignments. (*Id*.) Plaintiff graduated from high school in May 2014 with a C average in advanced math and special education classes. (R. 221-22). He applied for disability in July 2016, when he was 20 years old. (R. 181.)

On March 6, 2015, Plaintiff returned to Dr. Hummel for the first time since 2011. Plaintiff's parents reported that since graduating high school, Plaintiff had mostly stayed at home, with no motivation to do anything. (R. 319.) Dr. Hummel opined that Plaintiff was "struggling with a major depressive episode, which has been ongoing for years," and that he:

> is currently unable to care for himself or to make important decisions regarding his own health care or ADLs [activities of daily living]. His welfare will likely be better served with a guardianship in place and the possibility of group home placement if needed. He may also benefit from current in[-]home therapy or school placement to motivate him. Medication may help his mood and motivate as well, however in the past his mood has been very resistant to medication management.

---

Plaintiff's case through October 24, 2018, the date of the opinion, and thus, that this additional evidence did not relate to the period at issue. (R. 2.) Plaintiff does not contest the AC's ruling on this evidence.

[5] As the Illinois State Board of Education explains, an IEP "is a plan that describes the special education instruction, supports, and services that students with disabilities are legally entitled to receive.  An IEP is developed by school staff members, the student's parents/guardians and the student (when appropriate). The required contents of an IEP are determined by the student's needs and age as well as federal and state laws." https://www.isbe.net/Pages/Special-Education-Individualized-Education-Program.aspx

(R. 320.) On examination, Dr. Hummel found Plaintiff had poor insight but intact judgment, his behavior was guarded and withdrawn, he had a depressed mood and flat affect, and he was inattentive, although easily refocused. (R. 321.)

On August 13, 2015, Plaintiff underwent a consultative examination with David NieKamp, Psy.D. Dr. NieKamp observed that Plaintiff had appropriate eye contact, spoke clearly, and was appropriately groomed. (R. 323.) On examination, Plaintiff showed intact orientation and memory, and he displayed appropriate thought processes. (R. 325.) Dr. NieKamp opined that Plaintiff's "cognitive functions appear to be operating within expected developmental limits," and that his "reported psychological symptoms and behavioral history do not appear to be commensurate with depression and anxiety at this time." (R. 326.)

In May and June 2016, more than 14 months after Plaintiff's visit with him, Dr. Hummel wrote two letters. In the first, he wrote, in part, that "[o]ver the last two years [Plaintiff] is functioning very poorly. He is unable to leave the house & has few to no social contacts outside of his immediate family." (R. 348.) In the second letter, Dr. Hummel added that Plaintiff "has not been able to maintain gainful employment & is unable to care for himself on a day[-]to[-]day basis without support & assistance,"  and that his "depression has been resistant to medical intervention & as such he is unable to motivate himself, plan and initiate activities such as a job search, further education or social engagement." (R. 349.) On July 18, 2016, at a check-up with his primary care physician ("PCP") for issues including dry skin and jaw pain, Plaintiff denied feeling down, depressed, or hopeless. (R. 351-52.)

In August 2016, Plaintiff's father filled out a function report. He described Plaintiff's daily activities as sleeping until late afternoon, playing video games for hours and watching TV. (R. 203.) He wrote that Plaintiff needed reminders to take care of his personal hygiene and to take

medication and that his parents accompanied him to all medical appointments. (R. 203-04, 206.) Plaintiff's father stated that Plaintiff did not like to go outside and rarely did, and he did not spend time with other people, although he was well-mannered and got along with authority figures. (R. 204-07.) Plaintiff's father further noted that Plaintiff was unable to stay focused, took longer to complete tasks, and did not handle stress well. (R. 207-08.)

Also in August 2016, Plaintiff's former high school case manager, Jill Waichonas, filled out a questionnaire. She noted that Plaintiff had exceeded instructional levels in reading and math but that he had difficulty getting to his first class on time due to its 7:40 a.m. start time. (R. 211.) Ms. Waichonas also noted that Plaintiff had difficulty beginning tasks and completing tasks and often lost focus. (R. 212-13.) In addition, she wrote that Plaintiff had difficulty listening to directions and understanding them if they were not presented in a black and white manner, and he had problems interpreting facial expressions, body language, hints and sarcasm. (R. 212-14.)

On September 2, 2016, Plaintiff underwent a second consultative examination, this time with Glen Wurglitz, Psy.D. Plaintiff reported that his recreational activities included "visiting at a friend's home, having friends over, and listening to music;" he also told Dr. Wurglitz that he did not like people. (R. 357.) Plaintiff reported that he was able to make a shopping list, clean and vacuum his house, and take care of his hygiene, but he did not drive and did not go shopping alone. (*Id.*) Dr. Wurglitz observed that Plaintiff had an irritable and emotionally distant mood and flat affect, his speech quality was slow but clear, and he avoided eye contact. (R. 358.) On examination, Plaintiff was fully oriented, had no memory problems, had good abstract reasoning and judgment, and had adequate ability to complete a multiple-step task. (R. 358-59.) Dr. Wurglitz opined that Plaintiff might benefit from more intensive psychiatric treatment. (R. 359.)

4

On September 13, 2016, a non-examining state agency physician opined that Plaintiff had severe autistic disorders and affective disorders, and that these caused mild restriction in ADLs; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. 94-95.) The state agency physician disagreed with Dr. Hummel's more restrictive opinion from May 2016 because Dr. Hummel had not seen Plaintiff in an exam environment for more than 12 months before his statement. (R. 100-01.) In January 2017, this opinion was mostly affirmed on reconsideration, finding mild limitation in understanding, remembering or applying information; moderate limitation in interacting with others; moderate limitations in concentrating, persisting or maintaining pace; and moderate limitation in adapting or managing oneself. (R. 110.) On reconsideration the state agency doctor opined Plaintiff could perform three- to four-step tasks and productive activity with modified social demands. (R. 116.)

On November 19, 2016, Plaintiff returned to Dr. Hummel. Plaintiff reported that he was not motivated to do anything; he had anxiety about leaving the house and stayed home watching videos, sleeping or lying in bed. (R. 371.) Plaintiff stated that he left the house to go shopping with his brother but he stayed in the car because he did not like interacting with people. (*Id.*) Dr. Hummel observed that Plaintiff's affect was very flat and that his movements and responses were slow. (R. 371-72.) Plaintiff's mental status examination was normal, showing neat appearance, good eye contact, logical and coherent thought process, euthymic and congruent mood, appropriate attention, good insight, and intact judgment and memory. (R. 372.) Dr. Hummel wrote that Plaintiff was in a severe major depressive episode which had lasted for several years, but that "he has been refractory to pharmacological management and medical treatment."[6] (*Id.*)

---

[6] The term "refractory" can be used to describe a condition or symptom as well as a person. Cambridge dictionary defines "refractory" in the medical sense as "not affected by a treatment, change, or process,"

On December 17, 2016, Plaintiff followed up with Dr. Hummel. Plaintiff reported that he had no motivation to go outside, apply for a job, or meet people, and he used Xanax occasionally for anxiety. (R. 383.) Dr. Hummel opined Plaintiff might have an underlying medical condition, but Plaintiff refused bloodwork. (*Id.*) On examination, Plaintiff showed withdrawn behavior, intermittent eye contact, slow but understandable speech, neutral mood, depressed affect, inattentiveness (but easily refocused), poor insight, and appropriate judgment and thought processes. (R. 383-84.) Dr. Hummel noted that medications had not been effective in the past, but alternative treatments could help; Plaintiff refused additional treatment. (*Id.*)

On April 22, 2017, Plaintiff returned to Dr. Hummel. He reported receiving no benefit from taking Wellbutrin (an antidepressant),[7] and he continued to stay inside his house watching television or lying in bed, with no desire to do anything else. (R. 386.) His mental status examination was essentially the same as it was in December 2016, and Plaintiff remained "unmotivated for treatment or anything else." (R. 386-87.)

Plaintiff's next appointment with Dr. Hummel was on February 14, 2018. Dr. Hummel observed "no significant change" since Plaintiff's last appointment, with examination showing Plaintiff's behavior was withdrawn, he was inattentive but easily refocused, and he had intermittent eye contact, neutral mood, poor insight, intact judgment, and a "congruent, appropriate, dysphoric, flat" affect. (R. 388-89.) The "biggest difference" at this appointment was that Plaintiff "seem[ed] to have some marginal motivation to try to improve his situation." (*Id.*) Although Dr. Hummel noted that "[m]edications have not helped much in the past," he prescribed lamotrigine (a mood

and lists the formal definition as "difficult to control; unwilling to obey." https://dictionary.cambridge.org/us/dictionary/english/refractory. Similarly, Webster's Dictionary defines refractory as "resistant to treatment or cure," or as "resisting control or authority: stubborn, unmanageable." https://www.merriam-webster.com/dictionary/refractory.

[7] The record does not indicate when Plaintiff began taking Wellbutrin.

stabilizer and anticonvulsant) because it was "different than anything [Plaintiff] has tried before." (R. 389.) Dr. Hummel also prescribed Lunesta as a sleep aid and Xanax as needed. (R. 390.) Dr. Hummel opined that "[t]here may be an underlying vitamin deficiency, or other medical issue contributing to [Plaintiff's] depression and the refractory nature of it. Likely his family dynamic plays a part as well in his level of functioning and mood." (R. 389.)

That day, Dr. Hummel filled out a mental impairment questionnaire, writing that Plaintiff was "[u]nable to be in any social situation. Unable to leave house at all." (R. 363.) Dr. Hummel listed Plaintiff's symptoms as poor memory, sleep disturbance, decreased energy, mood disturbance, difficulty thinking or concentrating, social withdrawal or isolation, flat or inappropriate affect, psychomotor agitation or retardation, pathological dependence or passivity, and anhedonia or pervasive loss of interests. (*Id.*) He listed Plaintiff's clinical findings as completely flat affect, monotone, paucity of thought, response latency, and inability to visualize his future. (*Id.*) Dr. Hummel opined that Plaintiff had marked difficulties in maintaining social functioning; marked deficiencies in concentration, persistence or pace; moderate restriction in ADLs; and continual episodes of decompensation in work settings, which left him unable to complete tasks in a timely manner. (R. 364-65.) Dr. Hummel also noted that Plaintiff was "[v]ery non-responsive to medication," and "[v]ery refractory to treatment for depression." (R. 363, 365.)

Plaintiff also followed up with his PCP in February 2018. At that visit, he denied feeling depressed or down and reported that his depressive symptoms were somewhat controlled with Wellbutrin. (R. 397-98.) On March 30, Plaintiff followed up with Dr. Hummel, reporting that medication had not made a difference in his mood, energy level or sleep. (R. 391.) Dr. Hummel increased Plaintiff's dose of lamotrigine, discontinued Lunesta, added prescriptions for trazodone

(an antidepressant) and Adderall (a stimulant that treats ADHD), and recommended a follow-up in three weeks as well as completion of long overdue lab work. (R. 392-93.)

## II.    Hearing Testimony

On July 11, 2018, Plaintiff testified that he had never worked but that his father tried to have him help in his "ventures." (R. 59.) He testified that he did not leave the house, preferring to stay in his room or the basement because he did not like people and did not like going outside. (R. 60-61.) He was able to take care of himself and his hygiene, but he needed reminders to do so consistently. (R. 62.) Plaintiff testified that he was tardy almost every day in high school, and that there were times he was absent from school. (R. 68.) In response to his attorney's question about whether he could work at a simple, repetitive job, Plaintiff stated that "[a]ttendance would be an issue" because he would "be late rather frequently." (R. 63-64.) Plaintiff was unsure how difficult it would be for him to work near other people, and he indicated that his ability to work might be dependent on how much he was supposed to produce in a given timeframe. (*Id*.)

Plaintiff's mother testified that it was difficult to get Plaintiff out of the house on time for school because of his anxiety being around people and that the school frequently called her to pick Plaintiff up early due to his anxiety. (R. 70.) She stated that she and her husband had talked to Plaintiff about trying to find work, but they were not aware that there were vocational programs that could have helped him develop work skills. (R. 73, 77.) Plaintiff's mother testified that Plaintiff never wanted to leave the house, and she had to continually remind him and prepare him for scheduled appointments. (R. 73, 75.) She said that Plaintiff obtained his driver's license during high school but that he never drove. (R. 78.)

The ALJ presented a hypothetical to the vocational expert of an individual who could work at all exertional levels, with no driving and no concentrated exposure to work hazards, limited to

simple and routine tasks, simple decision-making with no multi-tasking, no more than occasional minor changes in the work setting and work at an average production pace. (R. 82-83.) In addition, the individual would require as little interaction with the public as possible (in person or over the phone) and was capable of only brief and superficial interaction with coworkers and supervisors, which excluded any teamwork or tandem-oriented tasks. (R. 83-84.) The VE opined that this hypothetical individual would be capable of performing certain unskilled medium or light work that was available in significant numbers in the national economy. (R. 84.)

### III. ALJ Opinion

On October 24, 2018, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act despite having the severe impairments of autism spectrum disorder, anxiety, and affective disorder. (R. 30.) After finding that Plaintiff's impairments did not meet or equal the severity of a Listing, the ALJ applied the paragraph B criteria. First, the ALJ determined that Plaintiff had mild limitation in understanding, remembering, or applying information, because he had a high school education, which included honors classes and special education classes, and he was able to play video games, do household chores, and keep up on current events. (R. 31.) Second, the ALJ found Plaintiff had marked limitation in interacting with others based on his testimony that he did not like people, "did not spend time with others, spent most of his time in his room, and did not want to go outside," as well as school records noting that Plaintiff "had a sustained impairment in social interaction," and progress notes from Dr. Hummel indicating that he "tended to be socially isolated and did not interact with many people outside of his immediate family." (*Id*.) Third, the ALJ found Plaintiff had moderate limitation in concentrating, persisting, or maintaining pace. The ALJ explained that on the one hand, Plaintiff's parents represented that he needed reminders and prompting to perform personal care, do

household chores and attend school and appointments, and school records indicating Plaintiff "had some difficulties with regard to staying focused and completing tasks on time;" on the other hand, Plaintiff "spent most of the day playing video games," he "was able to focus and persist in school in order to graduate and even took advanced math classes," and mental status examinations showed "intact memory, attention, and digit span and calculation ability." (R. 31-32.) Fourth, the ALJ found Plaintiff had moderate limitation in adapting or managing oneself because he had never attempted to work, had never sought vocational rehabilitation assistance despite it being offered, and school records showed he "was able to manage his workload and schoolwork with some assistance." (R. 32.) The ALJ found this commensurate with Plaintiff's "acknowledged a lack of motivation since graduating high school." (*Id*.)

The ALJ assigned Plaintiff the residual functional capacity ("RFC") to work at all exertional levels, but limited to: simple, routine tasks; no more than simple decision-making; no more than occasional and minor changes in the work setting; the exercise of only simple judgment; work requiring an average production pace, but not higher and not highly variable; and brief and superficial interaction with coworkers, supervisors and the public. (R. 33.) Further, Plaintiff could not perform work involving significant self-direction, multi-tasking, direct public service (in person or over the phone), teamwork or tandem tasks, and he could not work in "crowded, hectic" or hazardous environments, in order to accommodate his marked limitation in interacting with others. (R. 31, 33.) The ALJ stated that Plaintiff's moderate limitations in ability to focus, maintain pace and manage himself were accommodated with the limitation to "simple routine tasks involving no more than simple decision making, no more than occasional and minor changes in the work setting, [] work requiring the exercise of only simple judgment with no multitasking," and work with average production pace and no significant self-direction. (R. 32.)

The ALJ determined that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but that his statements concerning the intensity, persistence and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (R. 35.) The ALJ pointed to the "gap in mental health treatment after March 2015," as well as progress notes from Plaintiff's PCP indicating that he had denied feeling down, depressed, or hopeless. (R. 37.) In addition, the ALJ noted that Plaintiff was "able to successfully complete high school" with an IEP, "suggest[ing] that with appropriate accommodations, [Plaintiff] was able to fulfill his school schedule and work demands." (R. 39.) The ALJ emphasized that despite testifying that Plaintiff needed prompting and encouragement to get to appointments and school, Plaintiff's mother "could not explain why this prompting could not be utilized in order for [Plaintiff] to obtain and maintain employment" or to receive vocational or secondary education assistance, which Plaintiff never sought despite it being available from his high school. [8] (R. 39-40.) The ALJ also noted that despite his testimony to the contrary, Plaintiff "reported at one time that he has visited friends at their homes and has had friends over to his home." (R. 40.) Furthermore, the ALJ found that Plaintiff's "household dynamic is such that aggressive attempts to be employed is not a priority and is likely related to a failure for the claimant to try and seek work or vocational assistance" because Plaintiff's father had been unemployed for a decade, and Dr. Hummel opined that Plaintiff's family dynamic played a part in his level of functioning and mood. (*Id.*)

The ALJ accorded great weight to the state agency physicians' assessments but found that "in light of new probative evidence that these physicians did not have the opportunity to review, as well as the claimant's presentation at the hearing," Plaintiff had marked, rather than moderate,

---

[8] The ALJ also found that Plaintiff's mother's testimony that Plaintiff left school early on a regular basis or and "never left home alone" was not supported by the record. (R. 42.)

limitations in social functioning. (R. 40.) (The ALJ noted that Plaintiff had testified "in a hesitant manner with a soft voice" but had given "thoughtful well-articulated answers." (R. 31.)) By contrast, the ALJ "accorded no significant weight" to the letters Dr. Hummel prepared in May and June 2016 because: (1) at the time these letters were written, Dr. Hummel had not seen Plaintiff for more than a year; (2) Dr. Hummel "did not provide specific functional limitations related to [Plaintiff's] impairments and only provided cursory statements that [Plaintiff] has been functioning poorly and qualified for disability benefits, which is an issue reserved to the Commissioner of Social Security;" and (3) in July 2016, Plaintiff denied feeling depressed to his PCP. (R. 40-41.)

The ALJ also accorded no significant weight to Dr. Hummel's mental RFC opinion dated February 14, 2018. (R. 41.) The ALJ acknowledged that Dr. Hummel was a treating source and a specialist, but found that: (1) the opinion "appear[ed] to be based primarily on Plaintiff's and his parent's representation of [his] actions, rather than on objective clinical findings;" (2) "the level of limitation suggested by Dr. Hummel is not seen in the record" including in Dr. Hummel's progress notes, which "show[ed] low motivation, a flat affect, and occasional decreased attention that [was] easily refocused;" (3) contrary to Dr. Hummel's opinion, "the record does not show reduced intellectual functioning;" and (4) the opinion was not supported by Dr. Hummel's examination of Plaintiff that same day, during which Plaintiff reported feeling "more motivated for treatment and change," and Dr. Hummel opined that Plaintiff's symptoms may stem from "an underlying vitamin deficiency or other medical issue" and that his "family dynamic played a part as well in his level of functioning and mood." (R. 41-42.) Further, the ALJ noted that Dr. Hummel's notes "consistently [] described [Plaintiff] as lacking in motivation but there is no indication that he has ever been required to go out of his comfort zone," and the ALJ concluded that his "lack of motivation appear[ed] to be a primary issue in his unemployment." (R. 40, 42.)

Ultimately, based on the testimony of the vocational expert, the ALJ concluded that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy, and thus was not under a disability. (R. 43.)

## IV.  Analysis

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal citations and quotations omitted).

### A.  The RFC Was Supported by Substantial Evidence.

Plaintiff contends that the RFC assigned in the ALJ's opinion was not supported by substantial evidence. The Court disagrees.

#### 1.  Marked Limitations in Interacting with Others

Plaintiff contends that because the ALJ rejected Dr. Hummel's opinion and assigned a greater degree of limitation in social interaction than the state agency psychologists did, the ALJ "impermissibly" used his "own lay opinions" to identify the functional limitations in the RFC. (D.E. 16: Pl.'s Mem. at 9-10.) Plaintiff is incorrect. "When conducting the RFC analysis, an ALJ must include all of a claimant's limitations supported by the medical record." *Reynolds*, 25 F.4th at 473 (internal citations and quotations omitted). That is exactly what the ALJ did here. The ALJ identified the limitations in Plaintiff's RFC after considering the entire record, and found that later

evidence from Dr. Hummel, Plaintiff, and his parents showed that Plaintiff was more limited in his social interactions than indicated in the state agency opinions. In other words, contrary to Plaintiff's claim, the ALJ did not improperly attempt to "determin[e] the significance of particular medical findings" himself. *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018).

Plaintiff also contends that the ALJ failed to provide a narrative discussion of how the evidence supports each conclusion in the RFC, specifically that Plaintiff could interact with others in the workplace even briefly and superficially given his social difficulties. (Pl.'s Mem. at 10.) This contention is also without merit. The ALJ detailed the evidence supporting the assigned RFC. The ALJ acknowledged that Plaintiff testified that he did not like people and reviewed his and his parents' reports of how little he ventured outside. However, the ALJ reasoned that Plaintiff successfully completed high school and attended appointments with appropriate accommodations as well as prompting and encouragement, and Plaintiff's mother could not explain why she and her husband did not similarly prompt Plaintiff to seek vocational or secondary education assistance. (R. 39.) The ALJ also emphasized that Plaintiff "reported at one time that he has visited friends at their homes and has had friends over to his home." (R. 40.) The ALJ thus provided a narrative explanation of the substantial evidence supporting the social limitations in the RFC.

### 2. Moderate Limitation in Concentrating, Persisting or Maintaining Pace

Next, Plaintiff contends that the ALJ failed to account adequately for his moderate limitation in concentrating, persisting or maintaining pace ("CPP"). With regard to CPP, the ALJ limited Plaintiff to simple, routine tasks; no more than simple decision-making; no more than occasional and minor changes in the work setting; no work involving significant self-direction or multi-tasking; the exercise of only simple judgment; and work requiring an average production pace, but not higher and not highly variable. (R. 33.) Plaintiff contends that these limitations fail

to account for his difficulty focusing and staying on task and that the ALJ failed to define "average production pace." (Pl.'s Mem. at 11-13.)

However, the law "does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work" as "there is only so much specificity possible in crafting an RFC." *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020). In addition, the Seventh Circuit has indicated that a limitation to average production pace adequately accounts for moderate limitations in CPP. *See Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) (holding that "a moderate limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace"); *Martin*, 950 F.3d at 374 (holding that a CPP limitation to "stay on-task and thereby meet production requirements" was specific enough to account for a claimant who might operate at a slow pace); *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019) (finding that a limitation to average production rate adequately accounted for the claimant's moderate difficulties in CPP). Here, the ALJ further defined "average production pace" as not highly variable and requiring no significant self-direction or multi-tasking, and adequately explained that Plaintiff could manage that pace based on his successful performance in high school with a similarly supportive environment. (*See* R. 40.)

Plaintiff suggests that the RFC should have required someone to redirect him on the job because Dr. Hummel found Plaintiff was inattentive but easily redirected. (Pl.'s Mem. at 11-13.) But "an ALJ need only include limitations that are supported by the medical record." *Reynolds*, 25 F.4th at 473. The ALJ explained that he tailored the limitations in the RFC to account for evidence in the state agency opinions, Dr. Hummel's reports and the education records, as well as Plaintiff's and his parents' testimony. The ALJ weighed Dr. Hummel's note that Plaintiff was inattentive but easily redirected with this other evidence and concluded that substantial evidence did not support

Plaintiff's claim that he needed someone to constantly redirect him. In fact, as the ALJ explained, evidence from Plaintiff's high school showed otherwise, as he successfully completed regular as well as special education classes. *See Albert v. Kijakazi*, 34 F.4th 611, 615 (7th Cir. 2022) (upholding ALJ's RFC determination that limited claimant with autism spectrum disorder and ADHD to "simple, routine, and repetitive tasks in a relatively static work environment" because it was consistent with accommodations in the claimant's IEP, with which she was able to graduate from high school). The ALJ thus supported the RFC with substantial evidence.

**B.     The ALJ's Decision to Give No Significant Weight to Dr. Hummel's February 2018 Opinion Was Supported by Substantial Evidence.**

Plaintiff also argues that in assessing Dr. Hummel's opinion, the ALJ failed to consider the regulatory factors and improperly discounted the opinion because it appeared to be based primarily on statements from him and his parents. (Pl.'s Mem. at 13-14.) Plaintiff calls the latter "supposition on the ALJ's part," and contends that the ALJ ignored that the opinion was supported by objective findings from Dr. Hummel's own mental status exams as well as the September 2016 consultative examination. (*Id.* at 14.) The Court disagrees.

**1.     The ALJ's Determination that Dr. Hummel's Opinion Was Based Primarily on Plaintiff's and his Parents' Reports Was Supported by Substantial Evidence.**

Before concluding that Dr. Hummel's February 2018 opinion that Plaintiff "was unable to be in a social situation and unable to leave the house" was based primarily on Plaintiff's and his parents' representations, the ALJ painstakingly reviewed Dr. Hummel's notes from his six meetings with Plaintiff: March 2015, November 2016, December 2016, April 2017, February 2018 and March 2018. (R. 36-39.) The ALJ discussed both what Plaintiff and his parents "reported" and "described" of his everyday behavior as well as the results of Dr. Hummel's mental status examinations. (*Id.*) The ALJ then explained that Dr. Hummel wrote his opinion after a 30-minute

session with Plaintiff and despite having not seen Plaintiff since April 2017. Based on this, the Court finds that the ALJ's determination that Dr. Hummel's opinion was likely based primarily on Plaintiff's or his parents' statements rather than the doctor's own observations and examinations was supported by substantial evidence. Furthermore, this was a proper basis upon which to discount Dr. Hummel's opinion. *See Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022) ("[W]hen a physician's opinion is based primarily upon a patient's subjective complaints, the ALJ may discount that opinion.")

> **2.      The ALJ's Assessment of the Regulatory Factors Was Supported by Substantial Evidence.**

In assessing a treating physician opinion for claims filed before March 27, 2017, the ALJ must consider the length, nature and extent of the treatment relationship, the frequency of examination, the physician's specialty, the supportability of the opinion with medical signs and laboratory findings, and the consistency of the opinion with the record a whole. 20 U.S.C. § 404.1527(c)(1)-(5). Here, the ALJ recognized that Dr. Hummel was Plaintiff's treating psychiatrist but noted the infrequency of their treatment relationship, particularly the "gap in mental health treatment" between March 2015 and November 2016, which was then followed by only four more appointments over the next two years. (R. 37-38.)

In addition, contrary to Plaintiff's contentions, the ALJ considered the consistency, or lack thereof, of Dr. Hummel's opinion with the record (including the September 2016 consultative examination) as well as the supportability of the opinion, or lack thereof, with findings from Dr. Hummel's own mental status examinations. Indeed, the ALJ found that the severity of the limitations in Dr. Hummel's February 2018 opinion were inconsistent with Dr. Hummel's examination of Plaintiff that same day, during which Plaintiff reported feeling "more motivated for treatment and change." (R. 42.) Plaintiff argues that the ALJ improperly inferred that his

17

condition was less severe because he "desire[d] medical improvement." (Pl.'s Mem. at 8.) But that is not what the ALJ did. Rather, the ALJ appeared to point out that Plaintiff's new-found motivation to change was inconsistent with Dr. Hummel's opinion from that same day, in which Dr. Hummel opined that Plaintiff would never be able to improve and "was unable to be in a social situation and unable to leave the house."

The ALJ also found that "the level of limitation suggested by Dr. Hummel is not seen in the record" after a detailed review of the record as a whole. (R. 41-42.) The ALJ found Dr. Hummel's opinion was inconsistent with the following:[9]

- Plaintiff's high school record, which showed that despite Plaintiff being frequently tardy and sometimes struggling to complete homework and tests, he "earned good grades and was in several honors classes," had "demonstrated improvement since the beginning of his high school career and had a better mood, was more productive in class, and was able to hold conversations with his teachers and peers" (R. 35);

- Plaintiff's visits with his PCP in July 2016 and February 2018, during which Plaintiff denied feeling depressed or down (R. 37, 39);

- Plaintiff's September 2016 consultative examination, at which Plaintiff "stated that he helped with the dishes," "was able to do house cleaning," "noted that he has visited friends at their homes and has had friends over to his home," and "could concentrated on a task until it was finished," despite stating that "he was very socially awkward and did not have any desire for social interactions." (R. 37-38.) The ALJ also reviewed the results of this consultative examination, at which Plaintiff was irritable, emotionally distant, avoided eye contact and had a flat affect, but was fully oriented, had average to excellent memory, and demonstrated good abstract reasoning and judgment. (R. 38.)

In addition, the ALJ found that Dr. Hummel's mental RFC opinion was not supported by his own notes from his examinations of Plaintiff. The ALJ reviewed Dr. Hummel's notes in detail

---

[9] The Court follows the Seventh Circuit's mandate for reviewing courts to "consider the whole of the ALJ's decision," *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021), because "the five-step decision process comprises sequential determinations that can involve overlapping reasoning," and "to require the ALJ to repeat such a discussion throughout the decision would be redundant." *Zellweger v. Saul*, 984 F.3d 1251, 1254-55 (7th Cir. 2021) (internal citations and quotations omitted). In other words, "[a]n ALJ need not rehash every detail each time he states conclusions on various subjects." *Gedatus*, 994 F.3d at 903.

(R. 37-39), and concluded that "[o]verall, Dr. Hummel's progress notes show low motivation, a flat affect, and occasional decreased attention that is easily refocused," which did not support the level of limitation in Dr. Hummel's opinion. (R. 41-42.) The ALJ noted that Dr. Hummel's notes frequently stated that Plaintiff was not motivated to pursue treatment for his impairments or to leave the house, and that Dr. Hummel opined that "there might be an underlying vitamin deficiency or other medical issue contributing to [Plaintiff's] depression and the refractory nature of it," and that Plaintiff's "family dynamic played a part as well in his level of functioning and mood." (R. 40.) The ALJ found that the degree of Plaintiff's parents' involvement in his doctor appointments and his father's long-time unemployment also "suggests that the household dynamic is such that aggressive attempts to be employed is not a priority and is likely related to a failure for [Plaintiff] to try and seek work or vocational assistance." (*Id.*) The ALJ concluded that Plaintiff's "unemployment is reflective of a preference as opposed to a complete inability." (R. 42.)

Plaintiff argues that the ALJ drew the wrong conclusions from his lack of motivation and Dr. Hummel's notes about his family dynamic and possible underlying medical issues. Plaintiff contends that contrary to the ALJ's conclusions, Dr. Hummel's progress notes show that his low motivation and the fact that he was refractory to treatment are "symptoms" of his mental impairments that supported, rather than undermined, Dr. Hummel's February 2018 opinion. (Pl.'s Mem. at 4-5, 14-15.) In addition, Plaintiff argues that the ALJ's conclusion that his household dynamic discouraged him from seeking work or vocational assistance was speculative and erroneous. (*Id.* at 6-7.)

Plaintiff is "[e]ssentially . . . argu[ing] that the ALJ should have weighed the evidence differently," and asks this Court to "reweigh the evidence, contrary to well-settled case law on the standard of review for Social Security appeals." *Reynolds*, 25 F.4th at 474. Plaintiff would like the

19

Court to weigh the evidence from Dr. Hummel and elsewhere in the record and reach the conclusions that Plaintiff wants. However, the ALJ already weighed this same evidence and came to a different, but also reasonable, conclusion: that Plaintiff's low motivation and resistance to pursuing treatment – as demonstrated by his infrequent visits with Dr. Hummel and his refusal to get bloodwork done or take medication (at least until February 2018) – were evidence that Plaintiff's "unemployment [wa]s reflective of a preference as opposed to a complete inability."

In addition, it was not unreasonable for the ALJ to find that this conclusion was supported by the fact that despite being offered vocational or post-secondary assistance from Plaintiff's high school, neither Plaintiff nor his parents ever pursued any such assistance. Nor was it unreasonable for the ALJ to read Dr. Hummel's note that Plaintiff's family dynamic played a part as well in his level of functioning and mood as supporting the ALJ's conclusions.[10] The ALJ's determination was thus supported by substantial evidence. The determination "effectively requires [Plaintiff] to try to get a job and give work a shot. If working proves beyond [Plaintiff's] capacity, []he can apply again for Social Security benefits." *Albert*, 34 F.4th at 617.

**C.    The ALJ's Assessment of Plaintiff's Credibility Was Supported by Substantial Evidence.**

Plaintiff also contends that the ALJ did not adequately explain why Plaintiff's allegations that he was "essentially homebound and socially isolated," *i.e.*, that he was disabled, were not supported by the record. (Pl.'s Mem. at 8-9.) The Court "will not overturn a credibility determination unless it is patently wrong," which it will not be "[a]s long as an ALJ gives specific

---

[10] That said, the Court, like Plaintiff, is unsure what import either the ALJ or Dr. Hummel attributed to Plaintiff having possible underlying medical issues. The ALJ appears to relate this issue to Plaintiff's refusal to seek treatment or bloodwork to potentially diagnose any underlying issue. Regardless, this does not undermine the ALJ's conclusion that Plaintiff's refusal to seek treatment was evidence of his desire to remain unemployed rather than a symptom of his mental impairment preventing him from gaining employment.

reasons supported by the record." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). Here, as explained above, the ALJ painstakingly reviewed the evidence from Plaintiff, his parents, his school, his doctors and the state agency physicians, and concluded that Plaintiff was markedly limited in his social interactions, assigning limitations in the RFC accordingly. Among the evidence the ALJ cited was the September 2016 consultative examination report in which Plaintiff reported visiting friends at their homes. (R. 40.) Plaintiff calls this "an isolated and errant description," but there is no basis in the record for finding this description isolated or errant, especially in light of the sparse medical record in this case. (Pl.'s Mem. at 9.) The ALJ weighed the evidence and found Plaintiff's report that he visited friends, together with his high school performance, was inconsistent with his allegations that he was essentially homebound, thus undermining Plaintiff's credibility. This decision was supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to remand (D.E. 15) and grants the Commissioner's motion to affirm (D.E. 26).

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: September 7, 2022**